# UNITED STATES BANKRUPTCY COURT
# NORTHERN DISTRICT OF OKLAHOMA

Filed/Docketed
September 26, 2006

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| HENTGES, Michael E., | ) | Case No. 06-10451-R |
| | ) | Invol. Chapter 7 |
| Alleged Debtor. | ) | |

## MEMORANDUM OPINION

On August 1, 2006, the Court conducted a trial on the Involuntary Petition (Doc. 1) filed by Virginia D. Marks, individually, and as Trustee of the Virginia D. Marks Trust (collectively, "Mrs. Marks"), Tulsa National Bank, N.A. (the "Bank"), and Paul R. Hodgson ("Mr. Hodgson") (collectively, the "Petitioning Creditors") on April 21, 2006 (the "Petition Date"), and the Answer to Involuntary Petition (Doc. 26) filed by Michael E. Hentges ("Mr. Hentges") on June 22, 2006. Mrs. Marks appeared in person and through her counsel, Robert Glass and Brian Mitchell; the Bank appeared through its counsel, Michael King; Mr. Hodgson appeared in person and through his counsel, Mark Craige; and Mr. Hentges appeared in person and through his counsel, Stephen Capron. The Petitioning Creditors' Trial Brief (Doc. 28) was filed on July 13, 2006. On August 8, 2006, Mr. Hentges filed his Brief in Opposition to Application of Issue Preclusion to this Court's 4/18/2006 Findings in Case No. 05-30076-R (Doc. 45) ("Hentges Brief").

Upon consideration of the pleadings, the testimony of witnesses, the exhibits admitted, the evidence of which the Court takes judicial notice,[1] the briefs and arguments of counsel, and applicable law, the Court finds and concludes as follows:

## I.      Jurisdiction

The Court has jurisdiction of this involuntary Chapter 7 case by virtue of 28 U.S.C. §§ 1334, 157(a), and 157(b)(1); and Local Civil Rule 84.1(a) of the United States District Court for the Northern District of Oklahoma.

## II.     Contentions of the parties

In the Involuntary Petition seeking an order for relief against Mr. Hentges under Chapter 7 of the Bankruptcy Code, the Petitioning Creditors alleged that they were eligible to file an involuntary petition under Section 303(b) of the Bankruptcy Code and that, except for debts that were subject to a *bona fide* dispute as to liability or amount, Mr. Hentges was generally not paying his debts as they became due.

Section 303(b) of the Bankruptcy Code provides that if a putative debtor has twelve or more creditors, an involuntary case may be commenced upon the filing of a petition "by three or more entities, each of which is either a holder of a claim against such person that is not contingent as to liability or the subject of a *bona fide* dispute as to liability or amount . . . if such noncontingent, undisputed claims aggregate at least $12,300 . . . ."  11 U.S.C. §

---

[1]The Court takes judicial notice of the record developed in In re Michael E. Hentges, Invol. Case No. 05-30076, which was filed herein by the Petitioning Creditors on December 21, 2005, including orders, transcripts of the trial and post-trial proceedings, and exhibits admitted therein.  See CA 79-3511 St. Louis Baptist Temple, Inc. v. FDIC, 605 F.2d 1169, 1172 (10th Cir. 1979).  The Court also takes judicial notice of the pleadings and orders filed in this case.

303(b)(1).  Section 303(h) of the Bankruptcy Code states that a court "shall order relief against the debtor in an involuntary case under the chapter under which the petition was filed, only if . . . the debtor is generally not paying such debtor's debts as such debts become due unless such debts are the subject of a *bona fide* dispute as to liability or amount."  11 U.S.C. § 303(h)(1).

Mr. Hentges admits that he has twelve or more creditors.  Answer at ¶ 8.  Mr. Hentges does not dispute that he is liable to Mr. Hodgson in the amount alleged in the Involuntary Petition.  Id. at ¶ 5.  However, Mr. Hentges contests eligibility under section 303(b)(1) of the Bank and Mrs. Marks to commence an involuntary case against him, contending that their claims are subject to a *bona fide* dispute as to liability or amount.  Id. at ¶¶ 6, 7.  He also contends that he is paying his undisputed debts as they become due.  Id. at ¶ 4.  Finally, Mr. Hentges asserts that "the claims of these petitioning creditors have already been adjudicated on the merits" by this Court in a previous involuntary proceeding, and therefore they are barred from seeking an order for relief under the doctrine of *res judicata*.

## III.   Findings of fact and conclusions of law

### A.   *Res judicata* defense

On May 11, 2006, Mr. Hentges filed a Motion to Dismiss this Involuntary Petition (Doc. 9), claiming that the doctrine of *res judicata* prohibited the relitigation of the claims that he alleges were adjudicated in the case of In re Michael E. Hentges, Invol. Case No. 05-30076-R ("Hentges I") filed in this Court on December 21, 2005.  On June 12, 2006, the Court entered an Order Denying Motion to Dismiss (Doc. 22), because Hentges I was

dismissed *without prejudice* and therefore was not adjudicated on its merits.  In the Order

Denying the Motion to Dismiss, the Court stated:

> Rule 41 of the Federal Rules of Civil Procedure, made applicable to this proceeding by Bankruptcy Rules 7041 and 9014(c), governs the effect of voluntary and involuntary dismissals.  Rule 41(b), captioned "Involuntary Dismissal: Effect Thereof," provides that "[u]nless a court in its order for dismissal *otherwise specifies*, a dismissal under this subdivision and any dismissal not provided for in this rule, other than a dismissal for lack of jurisdiction, for improper venue, or for failure to join a party under Rule 19, operates as an adjudication on the merits."  Fed. R. Civ. P. 41(b) (emphasis added).  In dismissing Hentges I, the Court expressly specified that the dismissal was "without prejudice to refiling."  Accordingly, under Rule 41(b), the dismissal was not an adjudication on the merits.
>
> In order to establish that a claim is barred by *res judicata*, the previous action must have been concluded with a "final judgment on the merits."  Nwosun v. General Mills Restaurants, Inc., 124 F.3d 1255, 1257 (10th Cir. 1997); Satsky v. Paramount Communications, Inc., 7 F.3d 1464, 1467 (10th Cir. 1993).  "[A] dismissal without prejudice 'is a dismissal that does not "operat[e] as an adjudication upon the merits," . . . and thus does not have a *res judicata* effect.'"  Satsky, 7 F.3d at 1468, *quoting* Cooter & Gell v. Hartmarx Corp., 496 U.S. 384 (1990) (applying Rule 41(a)(1) concerning voluntary dismissals without prejudice).  See also Camarano v. Irvin, 98 F.3d 44, 47 (2d Cir. 1996) ("It is well established that a dismissal without prejudice has no *res judicata* effect on a subsequent claim"); In re Fischer, 252 B.R. 603, 609 (Bankr. E.D.N.Y. 2000) ("'A dismissal of an action without prejudice is an indication that the judgment is not on the merits and will therefore have no preclusive effect'" (*quoting* 18 James Wm. Moore, et al., Moore's Federal Practice, § 131.54[1] (3d ed. 1997))); Charles A. Wright & Arthur R. Miller, 9 Fed. Prac. & Proc. Civ. 2d § 2373 ("a dismissal without prejudice under subdivision (b), although a final termination of the present action, does not bar a second suit").
>
> Because Hentges I was dismissed without prejudice, Hentges cannot establish the existence of a final judgment on the merits.  Therefore the doctrine of *res judicata* does not bar the Petitioning Creditors from filing and prosecuting Hentges II.

Order Denying Motion to Dismiss at 4-5.

The Court rejects Mr. Hentges's *res judicata* defense at this juncture for the same reasons that are stated in the Order Denying Motion to Dismiss.

    B.    <u>Collateral estoppel effect of orders entered in Hentges I</u>

At trial, the Petitioning Creditors requested that the Court adopt the factual findings and legal conclusions made by the Court in all orders entered in Hentges I and find that the doctrine of collateral estoppel (or issue preclusion) precluded Mr. Hentges from controverting such findings and conclusions in this case. Those orders include the Order of Dismissal (Exh. 16) ("Dismissal Order"), the Order Denying Motion to Reconsider (Exh. 17), the Minute Order dated February 13, 2006 (Exh. 18), the Transcript of Telephonic Bench Ruling in Connection with Hearing Held January 26, 2006 (Exh. 19), the Order Denying Application of Counsel of Involuntary Debtor for Compensation and Reimbursement of Attorneys' Fees (Exh. 20) ("Attorney Fee Order"), and the Order Denying Motion to Modify April 18 Order ("Order Denying Motion to Modify") (Exh. 21).

The Petitioning Creditors did not raise the argument that Mr. Hentges was precluded from contradicting the Court's prior findings of fact or conclusions of law in Hentges I until their opening argument at trial in this case. Because the parties and witnesses had appeared and were prepared to proceed, and because Mr. Hentges did not have an opportunity to consider or brief the issue preclusion argument prior to trial, the Court declined to postpone the trial in order to research and rule on the Petitioning Creditors' preclusion argument, but rather proceeded with the trial, allowed Mr. Hentges to present evidence subject to the

Petitioning Creditors' preclusion argument, permitted Mr. Hentges to submit a post-trial brief, and took the matter of issue preclusion under advisement.

In his post-trial brief, Mr. Hentges's objects only to according preclusive effect to the facts found by the Court in the Attorney Fee Order.  Mr. Hentges argues that because the Court dismissed the involuntary petition in Hentges I on February 1, 2006, the merits of the Petitioning Creditors' first involuntary petition could not have been adjudicated in the Attorney Fee Order, and therefore none of the issues decided therein may be given preclusive effect in adjudicating the merits of the involuntary petition in this case.  See Hentges Brief at 2.  In advancing that argument, Mr. Hentges contends that the Petitioning Creditors did not establish the elements necessary to the application of *res judicata*, or claim preclusion.  The Court notes, however, that the Petitioning Creditors actually invoked the doctrine of collateral estoppel, or issue preclusion, which prevents the parties from revisiting factual or legal *issues* that were actually litigated and adjudicated in a prior proceeding, even if that earlier proceeding related to a different claim.

The Tenth Circuit Court of Appeals discussed the differences between claim preclusion and issue preclusion in Park Lake Resources LLC v. U.S. Dep't of Agriculture, 378 F.3d 1132 (10th Cir. 2004), as follows:

> *Res judicata* doctrine encompasses two distinct barriers to repeat litigation: claim preclusion and issue preclusion. [citations omitted].  Claim preclusion bars a party from relitigating a claim or cause of action on which final judgment has been rendered.  See RESTATEMENT (SECOND) OF JUDGMENTS § 24.  "Under [claim preclusion], a 'final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action'." [citation omitted].

This appeal concerns the other branch of preclusion doctrine–issue preclusion. In contrast to claim preclusion, issue preclusion bars a party from relitigating an issue once it has suffered an adverse determination on the issue, even if the issue arises when the party is pursuing or defending against a different claim. [citation omitted]. In general, issue preclusion applies when:

> (1) the issue previously decided is identical with the one presented in the action in question, (2) the prior action has been finally adjudicated on the merits, (3) the party against whom the doctrine is invoked was a party, or in privity with a party, to the prior adjudication, and (4) the party against whom the doctrine is raised had a full and fair opportunity to litigate the issue in the prior action.

Id. at 1136, *quoting* Dodge v. Cotter Corp., 203 F.3d 1190, 1198 (10th Cir. 2000).

The Attorney Fee Order denied an Application of Counsel of Involuntary Debtor for Compensation and Reimbursement of Attorneys' Fees. In the application, Mr. Hentges's counsel requested a judgment against the Petitioning Creditors for costs and attorney fees incurred by Mr. Hentges in obtaining the dismissal of the involuntary petition in Hentges I pursuant to 11 U.S.C. § 303(i)(1), and Mr. Hentges requested a judgment against the Petitioning Creditors for actual and punitive damages for filing the petition in bad faith pursuant to 11 U.S.C. § 303(i)(2). The Court held a hearing in which Mr. Hentges was given an opportunity to present evidence of (1) the reasonableness of fees and costs requested and (2) bad faith on the part of the Petitioning Creditors.[2] In addition to the evidence offered at that hearing, the Court took judicial notice of all prior proceedings, including the trial on the merits and the evidence admitted therein.

---

[2]The issue of damages was reserved to be heard at a later date in the event that Mr. Hentges was successful in proving bad faith.

In an ordinary case, once a case is dismissed for lack of jurisdiction, "any discussion of the merits of that claim is unnecessary to the judgment and therefore does not constitute collateral estoppel for purposes of future litigation of issues involved in that claim." Murdock v. Ute Indian Tribe of Uintah and Ouray Reservation, 975 F.2d 683, 688 (10th Cir. 1992).  In this case, however, in order to determine whether the Petitioning Creditors should be required to pay Mr. Hentges's fees and costs, the Court applied a "totality of the circumstances" test which required the Court to make findings regarding the merits of the Petitioning Creditors' claims.  See Higgins v. Vortex Fishing Systems, Inc., 379 F.3d 701, 706 (9th Cir. 2004).

> The following circumstances have been found to be relevant to the evaluation of an involuntary debtor's request for fees: "1) 'the merits of the involuntary petition,' 2) 'the role of any improper conduct on the part of the alleged debtor,' 3) 'the reasonableness of the actions taken by the petitioning creditors,' . . . 4) 'the motivation and objectives behind filing the petition' . . . [and] other material factors [the court] deems relevant." Higgins, 379 F.3d at 707-08, *quoting* In re Scrap Metal Buyers of Tampa, Inc., 233 B.R. 162, 166 (Bankr. M.D. Fla. 1999).

Attorney Fee Order at 18.  Thus, it was necessary to the Attorney Fee Order that the Court assess the evidence presented in support of the merits of the involuntary petition and the evidence presented at the hearing on the Section 303(i) motion, including evidence presented by Mr. Hentges with respect to the motivation and objectives of the Petitioning Creditors, on a creditor by creditor basis.  The Court made extensive factual findings concerning the circumstances under which Mr. Hentges became indebted to the Petitioning Creditors and his prepetition treatment of these Petitioning Creditors in order to assess whether the Petitioning Creditors' claims were valid, whether their decision to file an involuntary petition

was reasonable, whether they had good faith arguments that their claims were not subject to *bona fide* dispute and that Mr. Hentges was not paying his undiputed debts as they came due, and whether they filed the petition for a proper purpose.

Then, in order to evaluate whether the Petitioning Creditors should be liable to Mr. Hentges for damages for filing the involuntary petition in bad faith (as opposed to fees), the Court assessed whether the Petitioning Creditors filed the petition to obtain an improper advantage, whether "the petition was motivated by ill will, malice, or a desire to embarrass or harass" Mr. Hentges, whether a reasonable person would not have filed a petition against Mr. Hentges, and whether the Petitioning Creditors violated Bankruptcy Rule 9011 in filing the petition. Attorney Fee Order at 19.

In applying the elements of issue preclusion, the Court first concludes that certain (but not all) of the factual findings and legal conclusions stated in the Attorney Fee Order could contribute to satisfying some of the elements (but not all) for which the Petitioning Creditors bear the burden of proof in this case. Issues such as the factual bases of the Petitioning Creditors' claims and whether certain of Mr. Hentges's challenges to the claim were *bona fide* are identical to some of the issues the Court must decide in this case. The Attorney Fee Order is a final order on its merits, which satisfies the second requirement for issue preclusion.[3] Third, the party against whom issue preclusion is invoked, Mr. Hentges, was

---

[3]Mr. Hentges filed a Notice of Appeal of the Attorney Fee Order on May 2, 2006. On May 3, 2006, the Bankruptcy Appellate Panel issued a notice that the appeal was premature because Mr. Hentges had also filed a motion to modify the Attorney Fee Order on May 2, 2006. On June 1, 2006, the Court entered the Order Denying Motion to Modify. Mr. Hentges did not appeal the Order Denying Motion to Modify. On June 9, 2006, the

the party seeking payment of his fees and damages which were rejected in the Attorney Fee

Order, and he is the involuntary debtor in this case.  Finally, as the record reflects, Mr.

Hentges had a full and fair opportunity to litigate the issues that were decided in the Attorney

Fee Order.  "The inquiry into whether a party had a full and fair opportunity to litigate an

issue '[o]ften . . . will focus on whether there were significant procedural limitations in the

_____

Bankruptcy Appellate Panel dismissed the appeal of the Attorney Fee Order upon the Unopposed Motion to Dismiss Appeal filed by Mr. Hentges.  The Attorney Fee Order is therefore final.

    In the Order Denying Motion to Modify, the Court took under advisement the Petitioning Creditors' request that the Court sanction counsel for Mr. Hentges for alleged violations of Bankruptcy Rule 9011 and the Oklahoma Rules of Professional Conduct, as well as a request for reimbursement of fees and expenses incurred by the Petitioning Creditors in litigating the Attorney Fee Order.  Although an order has not yet been issued regarding possible sanctions against Mr. Hentges's counsel or regarding the Petitioning Creditors' entitlement to fees and costs, the reservation of those issues does not diminish the finality of the Attorney Fee Order or the Order Denying Motion to Modify.  See Budinich v. Becton Dickinson and Co., 486 U.S. 196, 199 (1988) ("[a] question remaining to be decided after an order ending litigation on the merits does not prevent finality if its resolution will not alter the order or moot or revise decisions embodied in the order").

    The Attorney Fee Order determined that Mr. Hentges was entitled to neither fees and costs nor damages under Section 303(i).  Whether Mr. Hentges must pay the Petitioning Creditors' attorney fees and expenses for litigating the Section 303(i) issue and whether Mr. Hentges's counsel violated Bankruptcy Rule 9011 or rules of professional conduct are issues collateral to and independent from the merits of Mr. Hentges's Section 303(i) motion, and a decision on these ancillary issues cannot alter or amend the decision contained in the Attorney Fee Order.  "[A]n unresolved issue of attorney's fees for the litigation in question does not prevent judgment on the merits from being final."  Budinich, 486 U.S. at 202.  A sanctions request is "even more collateral to the main action than . . . attorney's fees" and therefore does not frustrate the finality or appealability of a decision on the merits.  Cooper v. Salomon Bros., 1 F.3d 82, 85 (2d Cir. 1993).  See also Turnbull v. Wilcken, 893 F.2d 256, 257 (10th Cir. 1990) (where appellant failed to file appeal of judgment on merits until after resolution of sanctions motion, appeal of judgment on merits was out of time and was no longer appealable); Cleveland v. Berkson, 878 F.2d 1034, 1036 (7th Cir. 1989) (pendency of motions for Rule 11 sanctions "does not render the district court's judgment non-final").

    Although Mr. Hentges only contests the preclusive effect of the Attorney Fee Order, since the appeal time for all orders entered in Hentges I has expired, all such orders are final.

prior proceeding, whether the party had the incentive to litigate fully the issue, or whether effective litigation was limited by the nature or relationship of the parties.'" Murdock v. Ute Indian Tribe of Uintah and Ouray Reservation, 975 F.2d 683, 689 (10th Cir. 1992), *quoting* Sil-Flo, Inc. v. SFHC, Inc., 917 F.2d 1507, 1521 (10th Cir. 1990). The Court held a hearing on the involuntary petition wherein Mr. Hentges had the motivation and a full opportunity to contest the Petitioning Creditors' claims, and he had an additional opportunity to present evidence and argument at the time of the hearing on Section 303(i) motion.

Accordingly, to the extent that the issues in the Attorney Fee Order (as well as the other orders entered in Hentges I) overlap with the issues the Court must decide in determining whether to enter an order for relief in this case, the Court will consider such issues finally determined. Where issue preclusion is invoked as the basis for a finding or conclusion, the Court will refer to the order containing the particular determination of the issue.

    C.    Eligibility of Petitioning Creditors

            *1.    Mr. Hodgson*

Mr. Hodgson asserts a claim against Mr. Hentges in the amount of $8,561.02 based on two final, unappealed and unstayed judgments. See Judgments, Exh. 7, 8; Involuntary Petition, Exh. 24. Mr. Hentges does not dispute that he is liable to Mr. Hodgson in the amount alleged in the Involuntary Petition. Answer at ¶ 5. The Court concludes that Mr. Hodgson is an eligible Petitioning Creditor under Section 303(b)(1) of the Bankruptcy Code.

2.     *The Bank*

In the Involuntary Petition, the Bank asserts a claim of $29,400.00 against Mr. Hentges based on a Guaranty executed by Mr. Hentges (Exh. 3), in which he guaranteed payment of a promissory note (Exh. 2) executed by Mr. Hentges in his capacity as president of Michael E. Hentges, Inc. ("MEH, Inc.").[4]  In his Answer, Mr. Hentges claims that the debt is not liquidated and that "a set-off amount is due to Michael E. Hentges, Inc. (as well as to Mr. Hentges personally to the extent he has personal liability for any debt on a guarantee agreement with" the Bank.  Answer at ¶ 6.

In Hentges I, Mr. Hentges contended that he had been exonerated on the Guaranty pursuant to 15 O.S. § 338.  After reviewing the Guaranty in Hentges I, the Court concluded that Mr. Hentges expressly and unambiguously waived any and all defenses that would arguably arise under Section 338, and therefore the Bank's claim against Mr. Hentges on the Guaranty had not been extinguished by various extensions and modifications of the payment terms of the note.  Attorney Fee Order at 3, n.3; Order Denying Motion to Modify at 4-13.  In this case, Mr. Hentges did not argue, and is precluded from arguing, that his Guaranty had been exonerated under Section 338.  Thus, there is no dispute as to Mr. Hentges's liability on the Guaranty.

---

[4]Hentges I was dismissed because the Bank asserted a claim that included principal and interest owed on a debt guaranteed by Mr. Hentges, plus certain fees and expenses incurred by the Bank in responding to garnishment summonses and subpoenas relating to Mr. Hentges.  The Court found that there was a *bona fide* dispute as to Mr. Hentges's liability to the Bank for reimbursement of the fees and expenses.  In this case, the Bank asserts a claim for the principal and interest only, the amount of which was not disputed by Mr. Hentges in Hentges I.

Mr. Hentges does continue to dispute the *amount* of the liability however, contending that MEH Inc. and the Bank entered into an oral modification (or settlement) of the note and that the Bank breached the oral settlement agreement.  Thus, Mr. Hentges's argues that his $29,400.00 debt to the Bank is subject to a set-off in an amount that would compensate him for the Bank's breach of the oral agreement.  In the Attorney Fee Order, however, the Court found that the evidence presented in Hentges I was insufficient to conclude that MEH, Inc. and the Bank had come to any definitive agreement as to the terms of the purported settlement or that the terms of the settlement included a provision that released Mr. Hentges from his guarantee of payment of MEH, Inc.'s entire indebtedness.  Attorney Fee Order at 4 n.3, 14.  See, e.g., Rimell v. Mark Twain Bank (In re Rimell), 946 F.2d 1363, 1365-66 (8th Cir. 1991) (debtor's evidence of an oral modification of terms of note and guarantee was not sufficient for court to conclude that debtor's dispute of bank's claim was *bona fide*).  While this conclusion is binding on Mr. Hentges, and precludes him from asserting that the oral settlement agreement creates a *bona fide* dispute, the Court further concludes as a matter of law that even if the evidence in Hentges I and in this case was sufficient to establish that MEH, Inc. and the Bank had orally agreed to modify the payment terms of the note, as Mr. Hentges claims, such a modification would not be enforceable under Oklahoma law.  "A contract in writing may be altered by a contract in writing, or by an executed oral agreement, and not otherwise."  15 O.S. § 237.  "An oral agreement modifying a written contract, although established, is ineffective to alter the terms of the written contract until its terms have been fully executed."  Dewberry v. Universal C.I.T. Credit Corp., 1966 OK 77, 415

P.2d 978, 979.  Moreover, Section 237 precludes the terms of a written contract from
*extinguishment* by an unexecuted oral agreement such as a settlement agreement.  <u>See</u>
<u>Walker v. Johnson</u>, 1924 OK 516, 227 P. 113, 114.  Finally, "the subsequent 'executed oral
agreement' referred to in § 237 . . . must be established by 'positive, clear and convincing'
proof."  <u>Dewberry</u>, 415 P.2d at 979, *citing* <u>Bredouw v. Wilson</u>, 1953 OK 108, 256 P.2d 421.

Since it is undisputed that neither MEH, Inc. nor Mr. Hentges made any payments to
the Bank in compliance with the purported oral settlement agreement, the purported
agreement was not "fully executed" and therefore did not modify the terms of the note or the
Guaranty.  Mr. Hentges's claimed dispute with the Bank has no objective legal basis and
does not constitute a *bona fide* dispute so as to disqualify the Bank from the status of a
Petitioning Creditor.[5]

In Hentges I, Mr. Hentges admitted under oath that the amount of principal and
interest due on the note at that time was approximately $29,400.00.  Mr. Hentges did not
dispute the amount of the Bank's debt at trial in this case, other than his claim that he was
entitled to reduce the amount on account of the Bank's alleged breach of the oral settlement
agreement, a claim that the Court concludes cannot prevail under Oklahoma law.  The Court
concludes that the Bank established that it is the holder of a claim against Mr. Hentges that

---

[5]In determining whether a petitioning creditor is qualified, the Court "'must determine
whether there is an *objective basis* for either a factual or legal dispute as to the validity of the
debt.'"  <u>Bartmann v. Maverick Tube Corp.</u>, 853 F.2d 1540, 1542 (10th Cir. 1988), *quoting* <u>In
re Busick</u>, 831 F.2d 745, 750 (7th Cir. 1987)(emphasis added).  In doing so, the Court must
analyze the factual and legal issues underlying the dispute alleged by the debtor in order to
ascertain whether an objective legal basis exists for the debtor's challenge to the debt.

is not contingent as to liability or the subject of a *bona fide* dispute as to liability or amount, and therefore the Bank is a qualified Petitioning Creditor.

### 3.   *Mrs. Marks*

Mrs. Marks asserts a claim of $185,000.00 against Mr. Hentges which is equal to the face amount of an unstayed Judgment by Confession entered against Mr. Hentges by the Tulsa County District Court on September 21, 2005 (Exh. 9).  Mr. Hentges "admits that a judgment was entered in favor of Virginia D. Marks and Leslie D. Marks in the amount of $185,000."  Answer at ¶ 7.  Mr. Hentges "disputes the amount owed to Virginia D. Marks as a result of a set-off claim at issue in a suit filed in Tulsa County by Mr. Hentges and against Virginia D. Marks."  Id.  Mrs. Marks argues that only a factual dispute, a legitimate affirmative defense or a claim in recoupment is sufficient to subject a creditor's claim to a *bona fide* dispute for the purpose of Section 303.  More specifically, she argues that a putative debtor's assertion that he is entitled to set off the amount of the his claim against a petitioning creditor's claim does not place the claim in *bona fide* dispute unless the debtor's claim arose from the same transaction as the petitioning creditor's claim, and thus is in the nature of recoupment. Mrs. Marks contends that the claims that Mr. Hentges has asserted against her in the Tulsa County lawsuit are not in the nature of recoupment, and even if they were claims for recoupment, Mr. Hentges would be precluded from asserting them because they would have been compulsory counterclaims in the lawsuit resulting in the Judgment by Confession.  The facts relevant to Mr. Hentges's set-off argument and Mrs. Marks's response thereto are as follows:

In July 2005, Mr. and Mrs. Marks filed a petition against Mr. Hentges alleging claims of breach of contract, fraud, negligence, professional negligence and breach of fiduciary duty, commencing Tulsa County Case No. 2005-03882 (the "Marks v. Hentges Lawsuit"). See Verified Petition, Exh. 12D. Mr. and Mrs. Marks alleged that as their insurance agent and investment advisor, Mr. Hentges sold them a whole life policy on the life of Mrs. Marks and that on four separate occasions thereafter, Mr. Hentges approached Mr. and Mrs. Marks and induced them to borrow against the life insurance policy in order to loan money to entities that Mr. Hentges managed or in which he held an interest. In exchange for the four loans, which totaled $200,000.00, Mr. Hentges executed four notes on behalf of the entities and guaranteed the payment of three of the notes. Notes, Exh. 12F. The entities defaulted on the notes, and Mr. and Mrs. Marks made demand for payment from the entities and from Mr. Hentges. When neither the entities nor Mr. Hentges paid the notes in full, the Marks v. Hentges Lawsuit was commenced, in which, as stated above, Mrs. Marks asserted claims not only for breach of contract (i.e., non-payment of the notes), but also for fraud, negligence, professional negligence and breach of fiduciary duty, all arising from Mr. Hentges's conduct in inducing the Marks to borrow against life insurance to loan money to entities related to Mr. Hentges that ultimately defaulted on their obligations.

Although Mr. Hentges alleged that one or all of the notes (which were drafted by either Mr. Hentges or his counsel)[6] were illegal because they demanded a usurious interest

---

[6]In Hentges I and in a prior deposition, Mr. Hentges testified that the notes were drafted by his counsel, Cy Northrop. See Deposition Transcript, Exh 12E at 128.

rate, Mr. Hentges nevertheless offered to confess judgment in the amount of $185,000.00.[7]

Mr. and Mrs. Marks accepted the offer, and the Tulsa County District Court entered the

Judgment by Confession. See Exh. 12G, 12H, 12I. Mr. Hentges dismissed his counterclaims

without prejudice.  See Dismissal Without Prejudice, Exh. 10.[8]

The Marks also filed a complaint against Mr. Hentges with the Oklahoma Insurance

Commission, alleging that by inducing them to borrow against their life insurance policy and

to loan those funds to entities he managed or owned, Mr. Hentges breached duties he owed

toward them as their insurance agent and investment advisor. The Insurance Commission

held a hearing in which Mr. Hentges was afforded due process.  Upon its conclusion, the

hearing examiner found that Mr. Hentges had been "dishonest in his promises of repayment

of loans [to Mrs. Marks] and in the transfer of those funds from one business to another in

which he either owned or had a financial interest.  As her insurance agent and financial

advisor, he breached his fiduciary relationship to the detriment of Mrs. Marks and to his

benefit and that of his business ventures."  Order Revoking License of Michael Edmund

Hentges dated October 27, 2005 ("Revocation Order"), Exh. 12N, at 3, ¶ 8.  The hearing

examiner concluded that–

---

[7]Prior to confessing judgment, Mr. Hentges had filed chapter 7 bankruptcy on behalf of one of the borrowers, 76PW, LLC, and caused the other borrowing entity, REMS, to be dissolved as "not viable."  See Voluntary Petition filed on June 1, 2005 in In re 76PW, LLC, Case No. 05-13449-R (Bankr. N.D. Okla.); Revocation Order, Exh. 12N, at 3, ¶ 6.  Mr. Hentges (or his trust) owns a 25% interest in 76PW, LLC, and was its manager.

[8]The record does not reveal whether Mr. Hentges actually asserted counterclaims in the Marks v. Hentges Lawsuit.

3.  The evidence presented is clear and convincing that [Mr. Hentges] had a fiduciary relationship with Mrs. Marks as an insurance client, that he did not make a full disclosure as to how the money was to be used, that he did not advise as to the viability of [one of the borrowing entities], and that he was untruthful when he made the terms of repayment and defaulted on the first payment of each note.  If not dishonest, then he was an incompetent businessman.

4.  [Mr. Hentges] was coercive by approaching Mrs. Marks after a complaint was filed in attempting to have her agree not to give any testimony that he borrowed money from her, which she was in a very upset condition over having lost her savings [sic].

5.  The evidence is clear and convincing that [Mr. Hentges] used dishonest practices in the borrowing of money from Mrs. Marks [and another complainant] for enterprises in which he had a substantial financial interest including some which could not pay its bills.

6.  The evidence clearly shows [Mr. Hentges's] untrustworthiness and incompetence in using information he had about the financial affairs of Mrs. Marks [and the other complainant] to borrow money for ventures in which he had a substantial interest and for his benefit and his failure to repay and by defaulting on the first payment dates.

7.  All evidence taken together in this case shows a person who used his connections and persuasive powers to take the savings of two ladies in their retirement years for his personal benefit or that of his entities.  He was dishonest in his dealing with them and showed a total lack of integrity and honesty, which are character traits essential to a person being licensed as an insurance producer in the State of Oklahoma.

Revocation Order at 5-6.

Mr. and Mrs. Marks attempted to enforce the Judgment by Confession by issuing garnishment summonses and subpoenas to financial institutions and insurance companies that they believed may have owed money to Mr. Hentges.  In response, Mr. Hentges and five entities filed a lawsuit against Mr. and Mrs. Marks and their counsel in Tulsa County District Court, claiming damages for wrongful garnishment, defamation, intentional infliction of

emotional distress, abuse of process, malicious prosecution and intentional interference with contractual relations (the "Hentges v. Marks Lawsuit").  See First Amended Petition, Exh. 11.  On June 9, 2006, the Tulsa County District Court dismissed the wrongful garnishment, intentional infliction of emotional distress, abuse of process and malicious prosecution claims.  See Order Granting in Part and Denying in Part Defendants' Motion to Dismiss First Amended Petition and Brief in Support, Exh. 15.  The Tulsa County District Court declined to dismiss the claim of defamation and the claim of intentional interference with contractual relations.  Id.

In his claim for defamation, Mr. Hentges alleged that prior to and during the Marks v. Hentges Litigation, Mrs. Marks (and others) made comments to Mr. Hentges's "friends and business associates" that alleged or insinuated that Mr. Hentges "does not honor his obligations, that he is dishonest, that he cheated clients and others, and that he was generally a person of loathsome character," that "the comments were false, made knowing of their falsity, and made with the intent of causing harm to Mr. Hentges' good name and reputation. The ultimate goal of these efforts was to extort money from Mr. Hentges."  First Amended Petition (Exh. 11) at ¶¶ 41-45.

The claim against Mrs. Marks (and others) for intentional interference with contractual relations is asserted by the five entities that are co-plaintiffs in the Hentges v. Marks Lawsuit.  These entities allege that in attempting to collect the Judgment by Confession, Mrs. Marks (and others) "had clandestine communications designed to carry out a knowingly wrongful garnishment of funds which were known to be held for the purpose

of closing a pending real estate transaction" and that Mrs. Marks' counsel "took personal meetings" with "the lender who agreed to fund the various plaintiffs in this case in their acquisition of the real estate in question." Id. at ¶ 67. *Mr. Hentges* does not assert a claim against Mrs. Marks for intentional interference with contractual relations.

Accordingly, it appears that Mr. Hentges contends that he is entitled to reduce the amount of his debt to Mrs. Marks by the amount of any recovery he obtains on his defamation claim against Mrs. Marks and that the pendency of the defamation claim places the debt represented by the Judgment by Confession in *bona fide* dispute.  The Court concludes that Mr. Hentges's liability on and the amount of the Judgment by Confession is immune from Mr. Hentges's challenge for three reasons.

Without commenting on the merits of Mr. Hentges's defamation claim, the Court concludes as a matter of law that even if Mr. Hentges prevails in obtaining a judgment against Mrs. Marks on his defamation claim, such judgment will not create a *bona fide* dispute as to his *liability* on or the *amount* of the Judgment by Confession.  He has confessed liability.  The amount has been liquidated and has been reduced to a valid and collectable judgment.  A potential judgment against Mrs. Marks in a wholly separate lawsuit does not affect the *amount* of Mrs. Marks's judgment against Mr. Hentges.  It may ultimately affect the net amount that Mrs. Marks may collect in the future, but Mr. Hentges's debt to Mrs. Marks has clearly been liquidated by consent of Mr. Hentges, and as of the Petition Date, Mrs. Marks was entitled to execute on assets to satisfy the entire amount of the judgment.  Thus, the Court concludes that as of the Petition Date, Mrs. Marks was "the holder of a claim

20

that is not contingent as to liability or the subject of a *bona fide* dispute as to liability or amount" and therefore met all qualifications to act as a Petitioning Creditor.

Moreover, the better reasoned cases interpreting the *bona fide* dispute provision of Section 303(b)(1) hold that "a dispute as to the amount of a claim is not a *bona fide* dispute if it is based on a counterclaim arising from a wholly separate transaction." Liberty Tool & Manufacturing v. Vortex Fishing Systems, Inc. (In re Vortex Fishing Systems, Inc.), 277 F.3d 1057,1065 n.2 (9th Cir. 2002), *quoting* Chicago Title Ins. Co. v. Seko Investment, Inc. (In re Seko Investment, Inc.), 156 F.3d 1005, 1008-09 (9th Cir. 1998).[9]   See also Key

---

[9]In Seko, the Ninth Circuit explained that–

[Section 303(b)(1)] is not concerned with who ultimately owes money to whom; rather, it is concerned with whether the creditor's claim is disputed. Although there may be a dispute regarding who ultimately owes money to whom, Seko has not really disputed the validity of the *claim* filed by Chicago Title.   Instead, it contends that its counterclaim against Chicago Title, if successful, could yield enough money to cancel out its debt on the notes. . . . We therefore hold that the existence of a counterclaim against a creditor does not automatically render the creditor's claim the subject of a "*bona fide* dispute."   So long as the petitioning creditor has established that there is no dispute regarding the debtor's liability on the creditor's claim, the creditor has standing under section 303(b) to bring a petition.

*****

The practice of netting out the claims of debtors and their creditors only makes sense when a counterclaim for recoupment on a creditor's claim is involved. Such a counterclaim arises only out of the same transaction which forms the basis of the creditor's claim, see Newbery Corp. v. Fireman's Fund Ins. Co., 95 F.3d 1392, 1399 (9th Cir.1996) (*citing* 4 COLLIER ON BANKRUPTCY ¶ 553.03, at 513-15), and not when the counterclaim originates in a separate transaction. If recoupment applies, "the creditor's claim arises from the same transaction as the debtor's claim, [and] it is essentially a defense to the debtor's claim against the creditor rather than a mutual obligation." Id. at 1400 (*quoting* In re

Mechanical Inc. v. BDC 56 LLC (In re BDC 56 LLC), 330 F.3d 111, 120 (2d Cir. 2003) ("While it is clear that a claim is not subject to a *bona fide* dispute simply because the debtor has an unrelated counterclaim against a petitioning creditor, where a claim for offset arises out of the same transaction and is directly related to the creditor's underlying claim, and, if valid, could serve as a complete defense to that claim, a *bona fide* dispute exists.").  Some courts conclude that a creditor may be disqualified as a petitioning creditor if the creditor's claim is subject to a counterclaim that could reduce the amount of the claim below the statutory threshold.  See Seko, 156 F.3d at 1008, citing cases; see also Focus Media, Inc. v. Nat'l Broadcasting Co. (In re Focus Media, Inc.), 378 F.3d 916, 926 (9th Cir. 2004).  Both lines of cases involve *counterclaims* that are raised in the same lawsuit as the claim of the petitioning creditor.  In this case, Mr. Hentges dismissed any counterclaims he might have asserted in the Marks v. Hentges Lawsuit, and the amount of Mrs. Marks's claim against Mr. Hentges was liquidated in the Judgment by Confession; thus, the amount of the judgment is simply not subject to reduction by virtue of a counterclaim asserted in the Marks v. Hentges Lawsuit.

Finally, under Oklahoma law, a defendant is required to assert as a counterclaim any claim the defendant has against a plaintiff that arose out of the same transaction that

---

B & L Oil Co., 782 F.2d 155, 157 (10th Cir.1986)) (internal quotation marks omitted).

Seko, 156 F.3d at 1008-09.

provoked  the plaintiff to sue the defendant.  <u>See</u> 12 O.S. § 2013A.[10]  The failure to assert a

compulsory counterclaim in an action in which a judgment on the merits has been entered

"prevents a party from bringing a later independent action on that claim."  <u>Fox v. Maulding</u>,

112 F.3d 453, 457 (10th Cir. 1997), *quoting* <u>Oklahoma Gas & Elec. Co. v. District Ct., Fifteen

Judicial Dist.</u>, 1989 OK 158, 784 P.2d 61, 64.

 Apparently the Tulsa County District Court judge hearing the <u>Hentges v. Marks</u>

Lawsuit did not consider the defamation claim to be a compulsory counterclaim in the earlier

<u>Marks v. Hentges</u> Lawsuit because she declined to dismiss the claim on that ground.

However, if the defamation claim did not arise out of the note transaction for the purposes

of Section 2013, it cannot be a claim in recoupment that renders Mrs. Marks's Judgment by

Confession in *bona fide* dispute under the <u>Seko</u> line of cases. Conversely, if the defamation

claim could be found to arise out of the note transaction that was at the heart of the <u>Marks</u>

---

[10]Section 2013 A of title 12 of the Oklahoma Statutes provides–

COMPULSORY  COUNTERCLAIMS.  A  pleading  shall  state  as  a
counterclaim any claim which at the time of serving the pleading the pleader
has against any opposing party, if it arises out of the transaction or occurrence
that is the subject matter of the opposing party's claim and does not require for
its adjudication the presence of third parties of whom the court cannot acquire
jurisdiction. But the pleader need not state the claim if:

 1. At the time the action was commenced the claim was the
 subject of another pending action; or

 2. The opposing party brought suit upon his claim by attachment
 or other process by which the court did not acquire jurisdiction
 to render a personal judgment on that claim, and the pleader is
 not stating any counterclaim pursuant to this section.

v. Hentges Lawsuit, Mr. Hentges was required by Section 2013 to assert it as a compulsory counterclaim in the Marks v. Hentges Lawsuit, and by failing to do so, the defamation claim merged into the Judgment by Confession and is barred.

Accordingly, for the above-stated reasons, the unadjudicated defamation claim asserted against Mrs. Marks in the Hentges v. Marks Lawsuit does not place the Judgment by Confession in *bona fide* dispute as to liability or amount.

At trial, Mr. Hentges also argued that because the Judgment by Confession was awarded in favor of two plaintiffs, Mr. Marks and Mrs. Marks, Mrs. Marks could not be entitled to the full $185,000.00, but merely some portion thereof, and therefore her claim was not certain in amount.  However, when Mr. Hentges offered to confess judgment, he did not apportion the judgment amount between Mr. and Mrs. Marks, nor was the amount so apportioned in the Judgment by Confession.  Offer of Judgment, Exh.12G, and Judgment by Confession, Exh. 9.  In order to obtain a release of the judgment, Mr. Hentges would be required to pay the entire $185,000.00 to Mr. and Mrs. Marks jointly.  Mr. Hentges could not force Mrs. Marks to release her interest in the judgment by paying anything less than the full amount of the judgment.  Accordingly, the Court rejects Mr. Hentges's argument that the amount of Mrs. Marks' claim is in dispute because she and Mr. Marks are joint judgment creditors.  Mr. Hentges owes Mrs. Marks the entire amount of the judgment.

Mr. Hentges also disputes finality of Judgment by Confession because not all parties' claims were adjudicated and it is possible that Mr. Hentges could still appeal the judgment.  If Mr. Hentges contends that this creates a dispute as to his liability on the Judgment by

Confession, it was not raised in his Answer to the Involuntary Petition, so Mrs. Marks could not have been expected to present evidence or argument on that issue.  In any event, because the judgment was entered by agreement, the Court cannot imagine what grounds are available for an appeal by Mr. Hentges, and Mr. Hentges failed to present any evidence supporting any ground for an appeal.

        D.      <u>Not paying debts as they become due</u>

Section 303(h)(1) provides that –

> after trial, the court shall order relief against the debtor in an involuntary case under the chapter under which the petition was filed, only if –
>
> > (1) the debtor is generally not paying such debtor's debts as such debts become due unless such debts are the subject of a *bona fide* dispute as to liability or amount.

11 U.S.C. § 303(h).

Petitioning Creditors have the burden of demonstrating that Mr. Hentges is "generally not paying [his] debts as such debts become due."  <u>Society of Lloyd's v. Harmsen (In re Harmsen)</u>, 320 B.R. 188, 197 (B.A.P. 10th Cir. 2005).  The Tenth Circuit has held that "in determining whether a creditor has met its burden under 11 U.S.C. § 303(h)(1), . . . 'the bankruptcy court should examine the totality of the circumstances, balancing the interests of the debtor with those of the creditors.'"  <u>Id</u>. at 198, *quoting* <u>Bartmann</u>, 853 F.2d at 1546.  If Petitioning Creditors meet their burden, "the burden shifts to the debtor to show that the debts in question are subject to a *bona fide* dispute."  <u>Harmsen</u>, 320 B.R. at 197.

Many factors can be weighed in viewing a "totality of circumstances," including "(1) the number of unpaid claims; (2) the amount of such claims; (3) the materiality of the

nonpayments; and (4) the debtor's overall conduct in its financial affairs." Id. at 202.  Courts

also compare the number and amount of paid debts and unpaid debts.  Other factors could

include:

-the debtor's ability to satisfy only small periodic payments, not long-term obligations;

-the debtor's making regular payments only on small, recurring obligations, not on larger debts;

-the rapid decline in the value of the debtor's assets resulting from assets sales rather than profit generating activity;

-the amount of the debtor's debts compared to the debtor's yearly income;

-the debtor's voluntary shutdown of operations;

-the insider's deferred payment on account of loans payable to them;

-serious allegations regarding the conduct of the debtor's business;

-the apparent bad faith evidenced by corporate officers taking loans despite the company's financial distress;

-payments made by insiders both before and after filing;

-payments made by third parties or a waiver of claims by a third party;

-the debtor's statement of a subjective desire to pay the debts;

-the debtor's liquidation of its assets;

-the fact that payments have been made by some partners individually even thought the debts were those of the partnership;

-the fact that the due and unpaid debts are made up entirely of claims of the petitioning creditors while other nonpetitioning creditors are all paid.

Harmsen, 320 B.R. at 202, n.43, *quoting* 2 COLLIER ON BANKRUPTCY ¶ 303.14[1][b]
(Lawrence P. King ed., 15th ed. Rev. 2003).

The evidence at trial established that on the Petition Date, Mr. Hentges's financial
condition was bleak, at best.  Mr. Hentges had been unemployed for a significant period of
time and had been barred from selling insurance, a condition for which he refused to take
responsibility and for which he blames Mrs. Marks.  As of June 2005, Mr. Hentges was no
longer licensed to sell securities.[11]  Mr. Hentges testified that as of the Petition Date, he was
beginning to perform some consulting services for clients who were getting divorced, making
estate plans or entering into real estate transactions.  He testified that he had income of
approximately $10,200.00 in 2006:   $1,700.00 from his father's estate, $5,000.00 for
assisting with a real estate transaction for a friend, and $3,500.00 for estate planning for the
same friend.  All 2006 income was paid into the Michael E. Hentges Revocable Trust (the
"MEH Trust").  From that income, the MEH Trust made one mortgage payment on one of
his residences,[12] country club membership dues and some utility payments, and it
"reimbursed Nancy [Hentges] for bills she paid" on Mr. Hentges's behalf.  Mr. Hentges
contends that he has limited knowledge of his financial obligations related to his homes
because his wife, Nancy Hentges ("Mrs. Hentges") and Margaret Johnson, who is employed
by a related entity, handle the payment of his household bills.

---

[11]Prior to June 2005, Mr. Hentges sold securities and insurance, and assigned the
commissions generated from such sales to MEH, Inc.  It is unclear whether Mr. Hentges
allowed his license to sell securities to lapse or whether his license was revoked.

[12]Mr. Hentges owns two homes, one in Tulsa and one in Jenks.

Sometime in 2005 or 2006, Mr. Hentges formed Tax Planning Associates ("TPA"), which is allegedly owned by Mrs. Hentges[13] and Larry Davis,[14] and which employs Mrs. Hentges, although it is unclear what services Mrs. Hentges provides to the entity.[15]  From TPA, Mrs. Hentges earns net income of $2,543.16 per month.[16]  TPA operates from the Tulsa residence.  Mr. Hentges claims that TPA pays rent for use of the Tulsa residence, but does not know how much and contends there is no lease.  Although Mr. Hentges contends that Mrs. Hentges owns the company and would know about its operations, Mrs. Hentges had no idea when the company was formed, how many employees the company had, which employees who worked at the Tulsa residence were employed by TPA, whether TPA had a lease agreement with the Hentges for use of the residence, or whether TPA paid rent for use of the Tulsa residence.  When asked about other companies she owned, she was unsure of the names of the companies, when they were formed, and could not testify as to her exact

---

[13]Mrs. Hentges "guessed" that she owns approximately 80% of TPA, but was not sure.

[14]Larry Davis, CPA, has a 10% interest in TPA.

[15]Mr. Hentges denied knowing whether TPA was Mrs. Hentges's only employer, how long she had been employed by TPA, her job title or duties, and whether she had other monthly income from other entities.  The Court finds Mr. Hentges's testimony on this and other issues relating to the family's assets and income generally unreliable and incredible.
Mrs. Hentges testified that she answered the phone, paid bills and ran errands for TPA.  However, she also testified that Margaret Johnson handled all financial transactions, so it does not appear that Mrs. Hentges actually "paid bills."

[16]When asked about other income, Mrs. Hentges testified that she (or her trust) received distributions from TPA but could not remember how much she received or when or how often she received such distributions.  She testified that Margaret Johnson made transfers from TPA (and perhaps other entities) into a bank account established by her trust and that all inquiries about distributions or all other financial matters would have to be directed to Ms. Johnson.

interest in the companies.  She contended, however, that she "started the companies with partners," although she was not sure who her partners were in each company.

In July 2005, Mr. Hentges transferred to Mrs. Hentges his 70 or 80% interest in Housing and Tax Consultants LLC ("HTC") for no consideration other than "in lieu of divorce."[17]  In June 2005, immediately prior to the transfer of HTC to his wife, Mr. Hentges had represented to the Bank that his interest in HTC was worth $350,000.00. Mr. Hentges contends that Mrs. Marks's efforts to collect her judgment by garnishing the Bank of America escrow account in November 2005 "broke that company," and he now claims that HTC has no value.

Notwithstanding Mr. Hentges's lack of employment or other sources of income, and Mrs. Hentges's limited income, Mr. and Mrs. Hentges maintain two residences and they and their four children enjoy a country-club lifestyle.  MEH, Inc. pays thousands of dollars each month for luxury vehicles driven by Mr. Hentges, Mrs. Hentges, two of their children, and employees of related entities.[18]  It is unclear how MEH, Inc. earns income to pay the vehicle

---

[17]The Court notes that Mrs. Marks filed the Marks v. Hentges Lawsuit on July 1, 2005. Verified Petition, Exh. 12D.

[18]MEH, Inc., of which Mr. Hentges owns a substantial interest, leases five BMWs, one Mercedes, three Infinities and one Nissan for use by the Hentges family and employees of Hentges-related entities.  MEH, Inc. provides Mr. Hentges with the use of a 2005 BMW X5, Mrs. Hentges with a 2005 BMW 330 convertible, a daughter with a BMW Mini Cooper, and a son with an Infinity.  MEH, Inc. also supplies Marketing and Administrative Services LLC ("MAS") employees with vehicles:  Maggie Johnson drives a 2002 BMW 325 convertible; Tuesday Fletcher, a 2002 BMW X5; and Doug Wilcox, a 2004 or 2005 BMW 330 sedan. Larry Davis, who is an employee of either MAS or TPA or both, has use of a 2005 Mercedes E 350 sedan that is leased by MEH, Inc.  Mr. Hentges owns a majority interest (60-70%) in MAS and is a manager.  Mr. Hentges estimated his contingent liability on his guarantee of the leases at between $140,000.00 and $145,000.00.  MEH, Inc. also pays the premiums for

leases; Mr. Hentges stated only that MEH, Inc. provides vehicles and equipment for use by other entities "and gets paid for its services." Mrs. Hentges testified, however, that MEH, Inc. had been dissolved and had no business. Mr. Hentges testified that MEH, Inc. also pays health insurance premiums for the Hentges family. There is no evidence that Mr. Hentges pays MEH, Inc. for the use of the vehicles by himself or his family members or reimburses MEH, Inc. for health insurance.[19] Moreover, notwithstanding Mr. Hentges's failure to make any effort to pay his creditors, the Hentges family took a spring break trip to Puerto Vallarta, Mexico, in the spring of 2006.

Mr. Hentges contends that except for the one mortgage payment he made, Mrs. Hentges had been paying the mortgages, insurance, taxes and utilities on the Jenks and Tulsa properties, as well as all expenses for four children, the vacation to Mexico, country club dues, and clothing and cleaning with her income and/or assets. Mrs. Hentges's earnings from TPA are clearly not sufficient to make such payments. Mrs. Hentges could not explain how she obtained funds to pay these expenses.

Mr. Hentges also testified that a friend/partner/client provides him with a credit card with which he charges meals, entertainment, and gasoline, and which he contends he had no

---

insurance covering the vehicles.

[19]Mr. Hentges testified that he is not an employee of MEH, Inc. Mrs. Hentges testified that she was an employee of MEH, Inc. until it ceased doing business.

obligation to repay.[20]  This is the same friend who paid Mr. Hentges $8,500.00 for consulting services in 2006.

The Hentges family lives in the Jenks residence. All Hentges-related business entities, including MEH, Inc.,[21] Marketing and Administrative Services ("MAS")[22], the MEH Trust, TPA,[23] RNH Air 1, LLC,[24] and others, are operated from the Tulsa residence.  An individual, Brian Harper, took over Mr. Hentges's securities business when Mr. Hentges lost his securities license in June 2005, and Mr. Harper continues to sell insurance and securities from the Tulsa residence.  Neither Mr. Hentges nor Mrs. Hentges could clarify whether these entities pay rent to them for the use of the residence.

Mr. Hentges testified that the following debts[25] were being paid on a monthly basis:

| Creditor | Amount of debt (approx.) |
|---|---|
| Mortgages (2), tax and ins. on Tulsa home | $290,000.00 bal.<br>$2,500.00 mo. |
| Mortgage, tax and ins. on Jenks home | $400,000.00 bal.<br>$3,600.00 mo. |

---

[20]Mrs. Hentges also uses the credit card for gasoline; she testified that Ms. Johnson paid the credit card bill.

[21]Mr. Hentges (or his Trust) owns 49% of MEH, Inc.

[22]Mr. Hentges (or his Trust) owns 60-70% of MAS.

[23]Mrs. Hentges and Larry Davis (and perhaps others) own Tax Planning Associates.

[24]Mr. Hentges owns 33 1/3% of RNH Air 1, LLC.  That entity's only asset is a lawsuit against XL Specialty Insurance Company, an assignee of its lender.  Mr. Hentges is a guarantor of RNH debt.

[25]These debts are owed jointly by Mr. and Mrs. Hentges.

| Creditor | Amount of debt (approx.) |
|---|---|
| Utilities on Jenks and Tulsa homes | paid current |

In addition, Mr. Hentges admitted that he owed Columbus Life Insurance Company approximately $4,000.00 for commission advances which was being paid by offsets against renewal commissions that would otherwise be payable to Mr. Hentges (or one of his related entities).

Mr. Hentges testified that he was not paying the following debts, but contended that they were in *bona fide* dispute:

| Creditor | Amount of debt |
|---|---|
| Tulsa National Bank (guarantee of MEH, Inc. note) | $29,400.00 |
| Mr. and Mrs. Marks (judgment) | $185,000.00 |
| Bank of America (credit card debt arising out of use of personal credit card and guarantee of "corporate" credit cards) | $70,000.00 |
| Oklahoma Ins. Comm'n (judgment) | $3,500.00 |
| XL Specialty/Cessna Finance (guarantee; in litigation) | $1,000,000.00 |
| Richard Lowry (guarantee; in litigation) | $80,000.00 |
| Dallas AirMotive Inc. (judgment) | $390,209.16[26] |

Mr. Hentges does not dispute the existence of the judgment in favor Mr. Hodgson in the amount of $8,561.02 and admits that he is not paying it.[27]  The Court has already

---

[26]See Final Judgment entered September 30, 2005, Exh. 34.

[27]Mr. Hentges contends that *MEH, Inc.* disputes Mr. Hodgson's application of an MEH, Inc. payment of approximately $2,400.00 to the debt owed by Mr. Hentges personally.

concluded that debts to the Bank and to Mrs. and Mrs. Marks are not subject to a *bona fide* dispute.  Mr. Hentges claims that he is not paying his credit card debt to Bank of America because he and several related entities have sued Bank of America in the <u>Hentges v. Marks Lawsuit</u>.  In that action, Mr. Hentges and several related entities allege that Bank of America wrongfully froze funds deposited in an escrow account that was established by Mr. Hentges on behalf of another entity (which had been previously dissolved by Mr. Hentges) when Mrs. Marks attempted to garnish the funds in an effort to collect the Judgment by Confession.  <u>See</u> First Amended Petition, Exh. 11, Count One (Wrongful Garnishment/Attachment) and Count Four (Abuse of Process).[28]  Mr. Hentges does not argue that he is not liable on the credit card debt to Bank of America or that the Bank of America credit card debt is disputed in amount. Asserting claims against Bank of America concerning Bank of America's treatment of a deposit account established by another entity, which is not remotely related to Mr. Hentges's liability on the credit card debt, does not create a *bona fide* dispute of the credit card debt. Mr. Hentges admits that the Bank of America credit card debt is due in the amount of approximately $70,000.00 and that he is not paying it.

---

This disputed application occurred prior to the commencement of the action that resulted in the judgment in favor of Mr. Hodgson.  Mr. Hentges did not raise the misapplication issue in that action, most likely because it would have increased the amount Mr. Hentges owed to Mr. Hodgson.  MEH, Inc.'s dispute with Mr. Hodgson does not place Mr. Hodgson's judgment against Mr. Hentges personally in *bona fide* dispute.

[28]The entities also seek relief from Bank of America under Count Six (Intentional/Tortious Interference with Contractual Relations), Count Seven (Breach of Contract), and Count Eight (Conversion).

With respect to the debt of $3,500.00 owed to the Oklahoma Insurance Commission, when the Oklahoma Insurance Commission revoked Mr. Hentges's insurance license, it assessed a fine of $2,000.00 and costs of $1,500.00. Revocation Order, Exh. 12N at 5.[29] Mr. Hentges claims that he does not owe that debt because he has appealed the Revocation Order. The fact that a judgment has been appealed does not in and of itself create a *bona fide* dispute. It is apparent that the judgment has not been stayed because Mr. Hentges insists that he is no longer earning commissions from insurance sales due to the Revocation Order. The Revocation Order states findings of fact and conclusions of law that this Court deems sufficient to support the judgment. Mr. Hentges did not identify the factual or legal basis for his appeal of the Revocation Order to enable this Court to evaluate whether his appeal has any merit.[30] Thus, Mr. Hentges has failed to establish a *bona fide* dispute as to his liability on the Oklahoma Insurance Commission judgment. He admits that he is not paying that debt.

With respect to the Dallas AirMotive judgment, Mr. Hentges admits the existence of a judgment entered against him in Dallas County, Texas, but he denies owing that debt. Mr. Hentges, a resident of Oklahoma, contends that the Dallas County, Texas, court did not have personal jurisdiction over him and that the judgment is not valid. Mr. Hentges also

---

[29]Mr. Hentges was shown a copy of the Revocation Order at trial (as Exhibit 32). That exhibit was not admitted, although Exhibit 12N was admitted.

[30]Mr. Hentges admitted that the Oklahoma Insurance Commission judgment was affirmed by the District Court and stated that he had appealed the judgment "to the next level," but did not present any documentary evidence of the pendency of an appeal to the Oklahoma Supreme Court.

articulated a plausible defense to Dallas AirMotive's claim.  For the purposes of Section 303(h), the Court finds that the Dallas AirMotive judgment is in *bona fide* dispute.

Richard Lowry's claim against Mr. Hentges is for the recovery of attorney fees and expenses incurred by Mr. Lowry in protecting and recovering funds he entrusted to Mr. Hentges and/or one of his related entities.  Mr. Hentges deposited the funds in an escrow account established in the name of an entity that Mr. Hentges subsequently dissolved.  The funds were frozen by Bank of America when Mrs. Marks attempted to garnish the funds to satisfy the Judgment by Confession.  Mr. Lowry's claim is apparently based upon a guarantee.  The Court does not have sufficient evidence to evaluate the merits of Mr. Lowry's claim against Mr. Hentges or Mr. Hentges's defenses, and therefore concludes that Mr. Lowry's debt is in *bona fide* dispute.

Likewise, the Court does not have sufficient evidence to assess the merits of XL Specialty's claim against Mr. Hentges or Mr. Hentges defenses thereto.  It appears that Mr. Hentges guaranteed a note that was assigned to XL Specialty, that the guaranteed debt has not been liquidated, and that the debt is disputed by the principal obligor.  Thus Mr. Hentges's liability may be contingent upon the resolution of the dispute between the principal obligor and XL Specialty.  Accordingly, the Court concludes that this debt is in *bona fide* dispute.

Finally, Mr. Hentges has also incurred the following debts, but he claims that these debts were not yet due as of the Petition Date because he has made some arrangement with the creditor.

| Creditor | Amount of debt |
|---|---|
| Phil Rowland  (guarantee of MAS debt) | $525,000.00 |
| PayPal (credit card) | $2,600.00 |
| Capron & Edwards (legal fees) | > $10,000.00 |
| BMW, Mercedes, Nissan, Infinity (guarantees on vehicle leases) | $140-145,000.00 contingent  upon default by MEH, Inc. |
| Xerox (guarantee on copier lease) | $5,000.00 contingent upon default by MEH, Inc. |
| Brian Wiggs (remodeling on home) | has not demanded payment |

With respect to his debt to the Capron law firm for legal fees, Mr. Hentges stated that although he has incurred substantial legal fees which he has not paid and cannot afford to pay, he claimed that in accordance with an agreement with Mr. Capron, that debt was not "due" until he could afford to pay it.[31]  He also admits that he owes $2,600.00 on the PayPal credit card, but claims that payment is not due.[32]  Likewise, even though Phil Roland loaned $400,000.00 to MAS several years ago (pursuant to loan documents which were not available at trial), which has not been repaid, and which Mr. Hentges guaranteed, Mr. Hentges contends that the debt is not due until Phil Roland says its due.[33]

---

[31]To the extent that the Capron firm is representing Mr. Hentges as a co-party with a Hentges-related entity (such as RNH) in other litigation, the entity is paying the legal fees for representation of the entity and Mr. Hentges.

[32]Mr. Hentges testified that he tried to make a minimum payment on the PayPal credit card account, but the financial institution refused to accept the payment because of these pending involuntary bankruptcy proceedings.

[33]Phil Roland owns 15% of MAS and Mr. Hentges owns 60-70% of MAS.

Upon review of the totality of the circumstances, the Court concludes that Mr. Hentges is not paying his debts as they become due. Mr. Hentges claims that as of the Petition Date, he had earned no income in 2006.  Between the Petition Date and the time of trial, Mr. Hentges claims to have earned $8,500.00 performing consulting work for a friend, and received $1,700.00 from his father's estate, from which he has paid one mortgage payment, some utilities and country club dues.  No evidence of any projected future income is in the record. Mr. Hentges claims that Mrs. Hentges had been paying the three mortgages on the two residences, for a total of $6,100.00 per month, utilities on both homes, vacation expenses, the childrens' expenses, and all other household and living expenses, but Mrs. Hentges's monthly income was barely sufficient to pay even one mortgage payment.[34]  If she has other income, she did not know its source or amount.  Somehow, the Hentges family's living expenses are being paid.  The Court does not believe that Mrs. Hentges is capable of paying these expenses from the fruit of her labors.  To the extent that Mrs. Hentges receives distributions from TPA or other entities, it appears that Mr. Hentges is doing business through entities established in Mrs. Hentges's name so that he can avoid paying the creditors he has chosen not to pay.  Mrs. Hentges has no idea how these entities earn income or how much is funneled through her trust for the payment of the family's extravagant living expenses.  The Court further believes that Mr. Hentges has feigned ignorance of the operations of businesses nominally held by Mrs. Hentges.  Accordingly, although Mr.

---

[34]The testimony of both Mr. Hentges and Mrs. Hentges concerning the sources of funds for payment of their living expenses was evasive, inconsistent and generally not credible.

Hentges (through Mrs. Hentges, MEH, Inc. and other entities) is earning income and paying three mortgages, utilities on two homes, lease payments and insurance premiums on four vehicles, health insurance, country club dues, vacation expenses and other current living expenses, he is not paying other legitimate debts that are due.

Unpaid debts not in *bona fide* dispute include judgments in favor of Mr. Hodgson ($8,561.02 plus interest), Mr. and Mrs. Marks ($185,000.00 plus interest) and the Oklahoma Insurance Commission ($3,500.00 plus interest), the debt owed to the Bank ($29,400.00 plus interest), and credit card debt owed to Bank of America (approximately $70,000.00) for a total of at least $296,461.02.  If Mr. Hentges is taken at his word, his monthly or annual income is and will be insufficient to permit him to pay these debts.  In addition, Mr. Hentges has other significant debts that he is not paying merely because he has an agreement with friends or insiders to defer or waive payment.  These include Phil Roland, the Capron law firm, and the friend that provides him the use of a credit card.  To the extent that Mr. Hentges receives income or assets in the future, there is no reason to believe that he will not prefer these creditors to the Petitioning Creditors.

The Court also notes that Mr. Hentges has $145-150,000.00 in contingent liabilities for vehicle leases that are being paid by MEH, Inc., a company that Mrs. Hentges believes is defunct.  It was not established how MEH, Inc. funded the lease payments; Mr. Hentges testified that MEH, Inc.'s sole remaining function was as a conduit through which the vehicle leases (and the Xerox equipment lease) were held and paid.  Thus, Mr. Hentges's liability on

the lease guarantees may ripen in the near future, but there is no evidence that Mr. Hentges has the ability to pay these lease liabilities.

The Court finds that the evidence suggests that Mr. Hentges has divested himself of assets by dissolving entities and transferring interests to insiders in order to avoid paying his disfavored creditors.  Further, Mr. Hentges selectively invoked the separateness of related entities in order to defeat efforts of creditors to collect on their debts, but he treated entity funds as his own funds when doing so would benefit him.[35]  Further, the evidence strongly suggests that Mr. Hentges has used his wife (and her trust) as a front through which to transact business and funnel funds to pay living expenses while shielding the income from creditors.

The Court continues to believe that the totality of circumstances leads to the conclusion that Hentges's creditors would benefit from a thorough and independent investigation of Hentges's financial affairs, and the affairs of entities he controls, that could occur in a bankruptcy proceeding.  See Attorney Fee Order at 36.  For instance, a trustee could investigate whether the entities (and trusts) are actually alter egos of Mr. Hentges with assets available to pay creditors and whether transactions with Mrs. Hentges and other insiders are avoidable as preferences or fraudulent transfers.

---

[35]For instance, Mr. Hentges claimed that Mr. Hodgson's application of MEH, Inc.'s payment to his debt excused him from paying the judgment; he represented on a financial statement that he owned 100% of Hentges Investments LLC, when he only owned 48%; MEH, Inc. pays vehicle leases for family vehicles; MEH, Inc. pays the family's health insurance although neither Mr. Hentges nor Mrs. Hentges are employees of MEH, Inc.).

Moreover, the Court does not believe Mr. Hentges has been dealing with his creditors fairly and in good faith, but rather has been hostile and litigious toward legitimate claimants, has preferred one set of creditors (his mortgagees and vehicle lessors, for instance) over the Petitioning Creditors and other unpaid creditors, and has employed artifice and sham to avoid paying debts.

## IV.    Conclusion

Accordingly,  the Court concludes that the claims of the three Petitioning Creditors are not contingent as to liability or amount, nor is there a *bona fide* dispute as to their liability or amount, that the sum of their claims exceeds the statutory minimum of $12,300.00, and that Mr. Hentges is not paying debts that are not subject to a *bona fide* dispute as they become due.

An order for relief under Chapter 7 of the Bankruptcy Code shall be entered forthwith.

**SO ORDERED** this 26th day of September, 2006.


DANA L. RASURE
UNITED STATES BANKRUPTCY JUDGE